E-FILED
Monday, 30 June, 2008  03:46:27 PM
Clerk, U.S. District Court, ILCD

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF ILLINOIS

| | |
|---|---|
| ROBINS DINKINS and KENNETH SANDERS, | ) ) ) |
| Plaintiffs, | ) 06-2052 ) |
| v. | ) ) |
| BUNGE MILLING, INC., and UNITED STEEL, PAPER AND FORESTRY, RUBBER, MANUFACTURING, ENERGY, ALLIED INDUSTRIAL AND SERVICE WORKERS INTERNATIONAL UNION, AFL-CIO-CLC, | ) ) ) ) ) ) ) ) ) |
| Defendants. | ) |

ORDER ON MOTION FOR SUMMARY JUDGMENT

Plaintiffs Robert Dinkins ("Dinkins") and Kenneth Sanders ("Sanders") are African American men who work for Bunge Milling, Inc. ("Bunge"). The plaintiffs claim that Bunge and The United Steel, Paper and Forestry, Rubber, Manufacturing, Energy, Allied Industrial and Service Workers International Union AFL-CIO-CLC (the "Union") (of which the plaintiffs are members) have discriminated and retaliated against the plaintiffs, in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. 2000e *et seq.*, and 42 U.S.C. § 1981.[1]

Bunge, the Union, and the plaintiffs have filed motions for summary judgment. For the following reasons, the defendants' motions [85, 88] are granted. The plaintiffs' motion [100] is denied.

BACKGROUND

Bunge operates a corn and soybean mill in Danville, Illinois. It produces dry grain products and oils for use in foods and animal feed.

---

[1] The plaintiffs make numerous allegations of wrongdoing occurring before and during the pendency of this lawsuit. Many allegations do not fall within the plaintiffs' stated claims for relief, nor do they form the basis of a timely independent claim for which relief may be granted. The arguments not discussed herein have been considered by the court rather than overlooked. The court will limit its analysis only to potentially meritorious claims.

1

The plaintiffs are bound by the terms of the Union's collective bargaining agreement ("CBA") with Bunge. Among other things, the CBA describes the procedure for filling job openings, and specifies the four-step grievance process for resolving violations of the CBA.

Sanders has worked at Bunge since 1993, and Dinkins since 1994. Both men were hired as loaders/unloaders and have always worked in that capacity. The CBA classifies loaders/unloaders as "unskilled" positions. Loaders are primarily responsible for loading grain or oil into train cars and trucks. The loader/unloaders also perform related tasks such as cleaning, operating a switch board, and routine maintenance.

Over the years, Dinkins and Sanders have applied for operator positions, which are classified by the CBA as "skilled" positions. Caucasian applicants were selected for the open positions sought by Dinkins and Sanders.

Dinkins also believes he applied for a position in Bunge's lab. He cannot recall when he did so, but says it was around the time that three African Americans applied and were hired for lab positions.

In 2005, Dinkins sought entry into Bunge's electrician apprenticeship program.[2] At the time, there were two openings. Two Caucasian men were selected.

Dinkins and Sanders also allege that they have received disciplinary write-ups because of their race. Both men complain of numerous and allegedly undeserved disciplinary warnings or suspensions beginning in the 1990s and continuing into 2005. The warnings pertain to attendance, tardiness and required overtime; careless workmanship; safety violations; and, in Dinkins' case, interfering with supervision and/or insubordination as well as loud arguments and inappropriate behavior with management. The plaintiffs claim that some of the unwarranted discipline was in retaliation for assisting former Bunge employee Charles Bryant with his race discrimination lawsuit and/or unemployment claim. Dinkins and Sanders state that they filed grievances on many of the disciplinary actions, but never heard back from the Union as to the outcome.[3]

## ANALYSIS

Summary judgment "should be rendered if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). The party moving for summary judgment must show the lack of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 17, 23 (1986). Any discrepancies in the factual record should be

---

[2] Dinkins thinks he sought entry into other apprenticeships as well. Dinkins Dep. 114-15. However, he submitted his written application for the electrician apprenticeship program, and Dinkins took the test for apprentice electricians.

[3] Nonetheless, they attach to their response [d/e 105] copies of numerous grievance forms, which were investigated, reviewed, and denied by the Union because there was no finding of a violation of the CBA.

evaluated in the nonmovant's favor. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986) (*citing Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 158-59 (1970)). But "*only disputes over facts that might affect the outcome of the suit under the governing law* will properly preclude the entry of summary judgment." *Anderson*, 477 U.S. at 248 (emphasis added).

A party opposing summary judgment bears the burden to respond, not simply by resting on its own pleadings but by "set[ting] out *specific facts* showing a genuine issue for trial." *See* Fed. R. Civ. P. 56(e)(2) (emphasis added). In order to be a "genuine" issue, there must be more than "some metaphysical doubt as to the material facts." *Matsushita Elec. Ind. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).

Thus, "summary judgment is the 'put up or shut up' moment in a lawsuit, when a party must show what *evidence* it has that would convince a trier of fact to accept its version of events." *Johnson v. Cambridge Indus.*, Inc., 325 F.3d 892, 901 (7th Cir. 2000) (emphasis added). "If [the nonmovant] does not [meet his burden], summary judgment should, if appropriate, be entered against [the nonmovant]." Fed. R. Civ. P. 56(e)(2).

Affidavits must be based on the personal knowledge of the affiant and "set out *facts* that would be admissible in evidence." Fed. R. Civ. P. 56(e)(1) (emphasis added). Personal knowledge may include inferences and opinions drawn from those facts. *Visser v. Packer Eng'g Assoc., Inc.*, 924 F.2d 655, 659 (7th Cir. 1991). "But the inferences and opinions must be grounded in observation or other first-hand personal experience. They must not be flights of fancy, speculations, hunches, intuitions or rumors about matters remote from that experience." *Visser*, 924 F.2d at 659.

The court has combed through the *pro se* plaintiffs' pleadings, memoranda, and supporting documents to determine the contours of the claims for which this court may grant relief. Much of the plaintiffs' documentation is immaterial; it does not affect the outcome of a legitimate claim.[4] The plaintiffs' case against Bunge is limited to these narrow questions: (1) whether the plaintiffs were denied promotions and/or apprenticeship opportunities because of their race; (2) whether they were subjected to disciplinary action because of their race; and (3) whether they were retaliated against for supporting Charles Bryant's Title VII case or unemployment claim. The case against the Union is limited to whether, because of the plaintiffs' race, the Union failed to enforce the provisions of the CBA by refusing to pursue the plaintiffs' grievances.

---

[4] The plaintiffs first asserted their claim of intentional infliction of emotional distress in their memorandum opposing the defendants' motion for summary judgment. This is simply too late in the process to assert an entirely new claim. Nonetheless, the court notes that there is no evidence to support the necessary element of "truly extreme and outrageous" conduct "go[ing] beyond all possible bounds of decency, and to be regarded as intolerable in a civilized community." *Riley v. Wyeth*, 876 N.E.2d 740, 755 (Ill. App. Ct. 2007). Thus, even if the plaintiffs had raised this claim earlier in the litigation, they could not prevail on the evidence they have now presented to the court.

3

I.  Claims against Bunge

The plaintiffs bring their claims pursuant to Title VII and Section 1981.  They must establish the same *prima facie* case under either statute.  *Alexander v. Wisconsin Dep't of Health & Family Servs.*, 263 F.3d 673, 681-82 (7th Cir. 2001).

Unlawful discrimination may be shown by either the "direct" or "indirect" method. On summary judgment, the plaintiffs must present evidence to establish all elements of a *prima facie* case under one method or the other.  That the plaintiffs are African American and were not promoted (or were not accepted into the apprenticeship program, or were disciplined, or did not prevail on their grievances) does not establish that the plaintiffs were treated differently *because of* their race.  "That approach would turn the federal judiciary into a body of employment arbitrators asking whether personnel decisions are supported by 'just cause.'  The lack of 'just cause' would establish that forbidden discrimination or retaliation was the real cause.  That's not what the federal law says.  The burden of persuasion is the plaintiff's.  Whether or not [the employer] responded in the best way to . . . workplace acrimony [is] outside the scope of Title VII."  *Shafer v. Kal Kan Foods, Inc.*, 417 F.3d 663, 664-65 (7th Cir. 2005).

To prove race discrimination under the direct method, the plaintiffs must show that the employer had a discriminatory motivation – either an "outright admission" of discrimination or circumstantial evidence *pointing directly to* a discriminatory reason for an adverse employment action.  *Ptasznik v. St. Joseph Hosp.*, 464 F.3d 691, 695 (7th Cir. 2006) (emphasis added).[5]

Under the indirect method, the plaintiffs must show:  (1) they are members of a protected class; (2) they were performing their jobs in a satisfactory manner; (3) they were subjected to adverse employment action; and (4) similarly situated employees who are not African-American were treated more favorably.[6]  *See Patterson v. Avery Dennison Corp.*, 281

---

[5] In other words, the plaintiffs must show that they suffered an adverse employment action "*as a result*" of their race.  *Sylvester v. SOS Children's Villages Illinois, Inc.*, 453 F.3d 900, 902 (7th Cir. 2006) (emphasis in original).  The direct method may be shown by circumstantial evidence comprised of "suspicious words or actions" and inferences drawn therefrom. *Hossack v. Floor Covering Assoc.*, 492 F.3d 853, 862 (7th Cir. 2007).   This is the more onerous method to prove. *Sylvester*, 453 F.3d at 902.

[6] The plaintiffs cannot establish the fourth element of the *prima facie* case by substituting evidence of "prior and subsequent failures" involving other African Americans – the so-called "pattern or practice" method.  *N.A.A.C.P. Labor Comm. v.  Laborers' Int'l Union*, 902 F. Supp. 688, 711-12 (W.D. Va. 1993) (limiting such claims to those brought by the EEOC or class action plaintiffs).  The "pattern or practice" rules would allow an individual plaintiff to circumvent the fourth element of the *prima facie* case. "Neither Congress nor the courts have allowed individual private plaintiffs to avoid application of the *McDonnell Douglas* criteria by invocation of a 'pattern or practice' theory."  *N.A.A.C.P.*, 902 F. Supp. at 712 (*citing Scarlett v. Seaboard Coast Line R.R.*, 676 F.2d 1043, 1053 (5th Cir. 1982); 42 U.S.C. §§ 2000e-6(a), (c)).  Thus, the plaintiffs cannot rely on the experience of Bunge's other African American employees to prove

F.3d 676, 680 (7th Cir. 2002) (*citing McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973)). If the plaintiffs make the requisite showing, the burden then shifts to Bunge and the Union to articulate a legitimate, non-discriminatory reason for the challenged action. *McDonnell Douglas*, 411 U.S. at 802. If the defendants meet their burden, the plaintiffs must show that the articulated reason was pretextual. *McDonnell Douglas*, 411 U.S. at 804.

The court has reviewed the plaintiffs' evidence and finds that they cannot proceed under the more onerous direct method because they have not shown that they were subjected to less favorable treatment *as a result* of their race. Consequently, they must proceed under the indirect method. The plaintiffs, both African Americans, are members of a protected class. The court will assume (without deciding) that the plaintiffs were performing their job satisfactorily. Bunge's failure to hire the plaintiffs for operator or lab positions or to accept them into the apprenticeship program, and to subject the plaintiffs to unwarranted discipline, constitute adverse employment actions.

The only element in dispute is whether "similarly situated" individuals who are not African American were treated more favorably. *See Patterson*, 281 F.3d at 680. Similarly situated employees must be comparable in all relevant respects. *Humphries v. CBOCS West, Inc.*, 474 F.3d 387, 405 (7th Cir. 2007). With this element in mind, the court turns to the plaintiffs' claims.

A. Skilled operator positions

Dinkins and Sanders claim they applied for operator positions for which Caucasians were hired. As noted above, operator positions are "skilled classifications." CBA ¶ 82. The CBA specifies the procedures used to fill openings for skilled positions.

> Permanent vacancies in *skilled classifications*, excluding permanent vacancies in skilled maintenance classifications, which [Bunge] decides to fill will be posted to determine who is interested in the job and will be filled by assignment by [Bunge] *based upon qualifications and ability*. . . . Permanent vacancies in skilled maintenance classifications are filled by advancement from the apprenticeship program or by hiring from outside the plant. CBA ¶ 85 (emphasis added).

Thus, to determine whether the Caucasians hired for those positions were similarly situated to Dinkins and Sanders, the court looks to the successful candidates' qualifications and ability.

Dinkins cannot recall if he actually applied for an operator position in the 1990s, and does not know who filled the position he might have applied for. In 2002, Dinkins sought an operator position for which Jeff Chrostowski was hired. In 2003, Dinkins applied for two operator positions; he cannot recall if he applied for a third position. One of the positions was filled by Scott Boswell, and the other by Michael Hillison.

---

their case.

5

Chrostowski, Boswell and Hillison are Caucasian. However, they are not similarly situated to Dinkins because each of the three had prior experience as an operator.[7] In contrast, Dinkins did not have any experience as an operator or in any other skilled classification. Thus, Dinkins was not similarly situated to Chrostowski, Boswell or Hillison.

Sanders believes he applied for an operator position in the 1990s, but does not know who received that job. Sanders also believes he expressed interest in two operator openings in 2003. Bunge has no record of Sanders' application for the first opening in 2003, for which Boswell was hired. Sanders applied for the second position, for which Charlie Richards, a Caucasian, was hired. Richards had nine years experience as a mechanic. During his interview, Richards discussed his experience operating mechanical equipment and repairing machinery, which Bunge deemed relevant to the duties of a mill operator.[8] Sanders has no experience as an operator or in any other skilled classification at Bunge, nor did he possess any other recent relevant mechanical experience. Sanders was not similarly situated to either Boswell, who had experience as an operator, or Richards, with his nine years experience as a mechanic.

Therefore, Dinkins and Sanders cannot meet the fourth element of the *prima facie* case. Dinkins and Sanders were not similarly situated to Chrostowski, Boswell, Hillison, or Richards, each of whom possessed more relevant "qualifications and ability" for skilled operator positions.

## B. Lab position

Dinkins claims he applied for a position in the lab in 2000 but was passed over for the position. However, he admits that Bunge filled the lab openings with three African American applicants. Therefore, Dinkins cannot meet the fourth element of the *prima facie* case because he has not shown that a non-African American individual received more favorable treatment.

## C. Apprenticeship program

Dinkins claims that he was denied acceptance into the apprenticeship program because of his race. (As noted above, acceptance into the apprenticeship program would have rendered Dinkins eligible for a skilled maintenance position.) The apprenticeship program requires interested employees to submit an application and take the Flanagan Industrial Test ("FIT") administered by Danville Area Community College, and scored by people outside of Bunge. Dinkins submitted an apprenticeship application in 2005 and was one of approximately 100 Bunge candidates who took the FIT. The Bunge employees' FIT scores are categorized into high, midrange and low groups (with one-third of employees falling into the high group). Bunge evaluates the education and work experience/training of the applicants who score in the high

---

[7] Chrostowski had worked for six years as an operator; Boswell had four years experience as an operator; and Hillison had sixteen months experience as an operator when he applied for the operator position sought by Dinkins.

[8] The first duty of a mill operator is to "maintain correct and proper operation of all equipment pertaining to the milling process." Devore Aff. Ex. 7, p. 3.

group and decides which of those candidates to interview.[9]  Bunge employees receiving scores in the midrange or low groups do not receive further consideration for the apprenticeship program.  Dinkins scored in the midrange of the FIT.

Out of the approximately 100 test-takers, and approximately 33 who scored in the high range, only two individuals, both Caucasians, were accepted into the apprenticeship program during the relevant period.

Dinkins believes that he did better on the test than his score reflects.  However, he offers only his subjective belief about his test performance.  He also claims that no African Americans are in the apprenticeship program and that other African Americans felt they did better on the test than their scores would indicate, but there is no *evidence* to raise even the inference that test scores were altered to eliminate African Americans from the high group, as he suggests.[10]  Rather, Dinkins' contentions amount to speculation that racial animus kept him out of the apprenticeship program.  It is well settled that subjective belief and speculation are insufficient to survive summary judgment.

The Caucasians who were accepted into the apprenticeship program scored in the high range on the FIT.  They were not similarly situated to Dinkins, who scored in the midrange.  Dinkins has not made a *prima facie* case of discrimination in regard to the apprenticeship program.

### D.  Unwarranted discipline

The plaintiffs claim that Bunge has subjected them to unwarranted discipline because of their race.  The CBA specifies certain "Plant Rules," the violation of which may result in a verbal warning, written warning or second written warning.  The second written warning in a twelve-month period results in a suspension.  If an employee receives a third disciplinary ticket within twelve months after a suspension, the employee may be discharged.  CBA Ex. D.

Perhaps the most contested disciplinary action taken against the plaintiffs was for the underloading of a grain rail car in November 2003 (the "AEX 6424 incident").  The plaintiffs

---

[9] Thus, FIT scores are used to determine which candidates will receive further evaluation.  The highest-scoring candidate is not necessarily accepted into the program; candidates are rated on a 100 point-scale that evaluates education, work experience/training, testing, and the interview.  Willie Brazell, an African American, scored in the high range and was interviewed but not selected for the apprenticeship program.  Brazell believes he was passed over because of his race.  However, Brazell is not helpful to Dinkins' case; his test scores are not similar to Dinkins', and he is not a member of a different race who received more favorable treatment.

[10] That Brazell's test scores were in the high group tends to disprove Dinkins' contention.  Dinkins submits the affidavit of Michael Hardin, an African American, to show that Hardin, too, believed he had done well on the test.  Hardin's test scores were in the low group.  *See* d/e 102-9, pp. 7-21.  Hardin's subjective belief, like Dinkins', cannot create a genuine issue of material fact.

allege that they were disciplined in retaliation for assisting Charles Bryant with his lawsuit and/or unemployment compensation claim. The AEX 6424 incident is discussed more fully below, but it is also included in the more general discussion of the plaintiffs' disciplinary incidents.

Sanders received several warnings each year from 1993 to 2005.[11] He also received several two-day suspensions and one four-day suspension. Many of the warnings were for excessive absenteeism[12] and other attendance issues. Sanders was also disciplined for refusing to obey a supervisor's orders and failing to do the job assigned, excessive breaks, careless workmanship, and absence from the assigned work area for more than one hour. Each is a violation of the CBA's Plant Rules. Sanders frequently disagreed with the discipline but usually did not state a reason for his disagreement. Other times, he stated the discipline was "unjustified," or "I was sick" or that he "didn't see" the notice for required overtime. He denied the factual basis for one warning (the AEX 6424 incident), and denied his involvement in one of two incidents of careless workmanship that were written up on the same disciplinary form.

Dinkins has received several disciplinary tickets each year, starting in 1995. He has been cited for careless workmanship, absenteeism and tardiness. Dinkins also received three suspensions (in 1995, 2003 and 2004) for arguing with management in a loud, abusive and intimidating manner as well as a few two-day suspensions for accruing two written disciplinary warnings within a twelve-month period (in accordance with the CBA). Dinkins almost always disagreed with the discipline, sometimes without stating a reason and other times claiming harassment and retaliation for his having filed grievances, or blaming the situation on family emergencies or an inaccurate clock.

In order to prevail on this claim, the plaintiffs must show that a similarly situated individual with a comparable work record who is not African American was treated more favorably. In other words, they must show the another worker held a similar position and broke the rules in substantially the same way and was at the same level of progressive discipline as the plaintiffs but did not receive the same disciplinary action.[13] Despite more than forty disciplinary warnings accrued by the two men over a twelve-year period, they have not identified any

---

[11] Since 2005, Sanders has been on medical leave for a back injury.

[12] Excessive absenteeism is defined by the CBA as three occurrences of tardiness or three days of absence in any 90-day period. Extended illness verified by a doctor or group insurance records is excused. Absences of one or two days are not excusable. An employee who works less than four hours of a scheduled shift is considered absent. CBA, p. 42 [d/e # 102-15]. Each disciplinary warning states the dates of absence; Sanders's absences were spaced well apart in the 90-day period.

[13] Employees are not similarly situated if they are at different stages in the progressive discipline process because similar misconduct might result in a verbal warning for one employee but suspension for another.

similarly situated individual who is not African American and who received more lenient treatment for the same conduct.[14]

### E. Retaliation

The plaintiffs allege that the disciplinary action arising from the AEX 6424 incident was taken in retaliation for the assistance they provided to Bryant on his lawsuit and/or his unemployment claim. Bryant was a laboratory assistant who left Bunge in September 2002. He filed a Title VII race discrimination complaint against Bunge in 2003. The plaintiffs also state that Bryant pursued an unemployment compensation claim, for which they provided assistance. See Plaintiffs' Response, d/e 105, p. 3. The plaintiffs claim they assisted Bryant in 2002 and 2003.

The AEX 6424 incident occurred in November 2003. The incident involved the underloading of a rail car. The company claimed that the completed loading form reflected Sanders' and Dinkins' initials. The plaintiffs pointed out that they had begun to fill out the form in turquoise ink, but the form was completed in black ink. Dinkins produced the turquoise pen to prove that they had begun the loading on their shift, but the subsequent shift had underloaded the car and completed the form. Management apparently did not believe Dinkins and Sanders, and disciplined the plaintiffs for underloading the car. Union steward Tru Serapinas was asked to attend the meeting with Dinkins, Sanders, and Bunge supervisors, and later wrote an informal two-page statement about the meeting.[15] Serapinas apparently believed that Dinkins and Sanders were falsely accused. By her account, the meeting was unpleasant and loud; she stated that Dinkins admitted to "getting loud" but Dinkins blamed it on a Bunge supervisor, who "got loud first."

The Disciplinary Action report stated that Dinkins "made inappropriate statements and engaged in inappropriate behavior in his discussion with" the Bunge supervisor. Dinkins received two disciplinary tickets – one for careless workmanship, and one for his conduct at, and after, the meeting. As a result, he was suspended for fifteen days. Sanders received a first written warning for careless workmanship.

To prove a retaliation claim under either Title VII or Section 1981,[16] the plaintiffs may proceed under the direct or indirect method. The direct method requires a showing of (1) a

---

[14] Although Dinkins' written disciplinary responses state that various supervisors were argumentative, abrasive, and intimidating to him – and, presumably, they were not disciplined – Bunge's supervisors are not similarly situated to Dinkins.

[15] Her statement is not in the form of an affidavit.

[16] This court had earlier ruled that a retaliation claim cannot be pursued under Section 1981. Since then, Seventh Circuit case law has changed to allow such claims. *See Humphries*, 474 F.3d at 397-403 (overruling *Hart v. Transit Management, Inc.*, 426 F.3d 863 (7th Cir. 2005)).

statutorily protected activity; (2) an adverse employment action; and (3) a causal connection between the two. *Humphries*, 474 F.3d at 404.

The court will assume for the purposes of this motion that the plaintiffs can show that they assisted Bryant with his claims (although Bunge claims it was unaware of any assistance that the plaintiffs provided to Bryant). As noted previously, disciplinary warnings may constitute an adverse employment action.

However, there is no evidence of a causal connection between the protected activity and the discipline. Suspicious timing is evidence of retaliatory motive, provided there is other evidence supporting the inference of causation. *Lang v. Illinois Dep't of Children & Family Servs.*, 361 F.3d 416, 419 (7th Cir. 2004). But there must be an "extremely short lapse of time" between the protected activity and the discipline. *Lang*, 361 F.3d at 421. In *Lang*, the Seventh Circuit found "extremely suspicious" the timing of the plaintiff's discipline the same month he complained of discrimination, after five years of positive attendance and performance reviews. *Lang*, 361 F.3d at 420. In the instant case, the plaintiffs did not experience a telling increase in either the *frequency* or *type* of disciplinary action in 2002 and thereafter – including the AEX 6424 incident – as compared to the previous eight years.

To prove a retaliation claim under the indirect method, the plaintiffs must show that (1) they were performing their jobs satisfactorily; (2) they opposed the employer's discriminatory conduct; (3) they were subjected to adverse employment action; (4) a similarly situated employee who did not oppose the discriminatory conduct was treated more favorably. *Humphries*, 474 F.3d at 404.

Once again, and assuming that the plaintiffs can prove the first three elements, the plaintiffs' case fails on the fourth element: they have not identified an individual who did not assist Bryant and who received more favorable treatment for substantially similar conduct.

Consequently, the plaintiffs have failed to establish a *prima facie* case of retaliation against Bunge.

Because the plaintiffs cannot establish a prima facie case on any of their claims against Bunge, summary judgment is granted in Bunge's favor.

## II. Claims against the Union

The plaintiffs claim that the Union has failed to pursue their grievances because of their race. As noted earlier, to succeed on their claim, the plaintiffs must show: (1) they are members of a protected class; (2) they were performing their jobs in a satisfactory manner; (3) they were subjected to adverse employment action; and (4) similarly situated employees who are not African American were treated more favorably. *Patterson*, 281 F.3d at 680. If the plaintiffs make the requisite showing, the burden then shifts to Bunge and the Union to articulate a legitimate, non-discriminatory reason for the challenged action. *McDonnell Douglas*, 411 U.S. at 802. If they do so, the burden shifts back to the plaintiffs to show pretext. *McDonnell Douglas*, 411 U.S. at 804.

The plaintiffs have not shown either an adverse employment action or a similarly situated non-African American individual who received more favorable treatment. A number of the plaintiffs' grievances were investigated, as shown by the documents attached to their response [105]. It is true that the grievances were not concluded in favor of the plaintiffs, but that, in itself, is not an adverse employment action because there is no indication that the grievances had merit.[17] Nor do the plaintiffs identify any other individuals for whom grievances over the same conduct and issues were treated any differently by the Union.

Moreover, the Union pursued to the pre-arbitration stage Dinkins' grievance about the AEX 6424 incident. Dinkins, who was represented by counsel, attaches to his motion correspondence [d/e 100-2, 100-3, Ex. KK-10] relating to the arbitration. The Union Local vice president informed Dinkins that no date had been set to arbitrate Dinkins' grievance because the Union proceeds more quickly on discharge cases than on other grievances.[18] At the time, the Union had set two discharge cases for arbitration, so Dinkins' arbitration was delayed. The National Labor Relations Board, in October 2006, informed Dinkins that it would probably be at least a year before his case would go to arbitration. In February 2007, Dinkins chose to withdraw his case. Dinkins has not identified any individual who received more favorable treatment by the Union in regard to arbitration of a suspension.

The plaintiffs have failed to identify a similarly situated individual who is not African American and who received more favorable treatment by the Union. Therefore, they cannot succeed on their claim against the Union. Thus, summary judgment is granted in favor of the Union.

## CONCLUSION

For the foregoing reasons, the defendants' motions [85, 88] are granted. The plaintiffs' motion [100] is denied. All pending motions *in limine*, motions to strike, and motions for sanctions are moot. This case is terminated. The parties shall bear their own costs.

Entered this 29th day of June, 2008.

**s\Harold A. Baker**
_____
HAROLD A. BAKER
UNITED STATES DISTRICT JUDGE

---

[17] The grievance procedure is meant to resolve issues "concerning the meaning, interpretation, or application of [the CBA]." *See* d/e 102-14, ¶ 21. It is not intended as a vehicle to complain about general workplace disagreements, nor can the plaintiffs make it function as such by claiming that management decisions amount to intimidation or coercion. *See* d/e 102-15, ¶ 239. As noted above, it is not the court's role to serve as employment arbitrator over general personnel matters. *Shafer*, 417 F.3d at 664-65.

[18] To the extent that Dinkins suggests a discriminatory motive for this decision, there is no evidence to support this conclusion. That the Union prioritizes arbitration by the severity of the discipline is quite understandable.